[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM Of DECISION
This custodial dispute, centered upon allegations of child abuse, arises within a dissolution action. It involves a plaintiff wife, aged 48, and a defendant husband, aged 45, who married in Port Jefferson, New York on November 6, 1982, nine years ago. This was the second marriage for each.
There were two minor children of their marriage:
Benjamin born September 29, 1983, aged 8.
James born January 24, 1985, aged 7.
They have both continuously resided in this state for the past twelve months. Neither is the recipient of public assistance from the State of Connecticut or any governmental subdivision. Each testifies that their marriage has broken down irretrievably.
Atty. Deborah L. Grover represented the plaintiff wife.
Atty. James Mulvey represented the defendant husband.
Atty. Michael J. Manion represented the minor children.
Stephen Herman, M.D. was the court appointed evaluator.
Leslie Raider was the Family Relations Counselor.
Christine Lupke was the DCYS social worker investigator.
Barbara Bernstein, Ph.D., was the children's therapist.
This hearing consumed nine days of testimony, produced 64 exhibits and offered seven witnesses. The attorneys were well prepared. They represented their clients with vigor while maintaining professional and dignified demeanor at all times.
FINDINGS RE: CLAIMS OF ABUSE CT Page 6396
The testimony is conflicted and contradictory. Six professionals invested a great deal of time and effort in pursuing the plaintiff mother's allegations of abuse against the father.
Five of the six professionals did not find abuse:
1. The Brookfield police department found "there is not sufficient evidence to pursue any criminal charges against Hart Van Meter".
2. DCYS called Benjamin's pediatrician, who found no physical evidence of sexual molestation.
3. Dr. Bernstein, the children's psychological evaluator and therapist, testified that after a year and a half of counseling with the children, she still did not know if physical or sexual abuse occurred.
4. The Family Relations Counselor, Leslie Raider, concluded: "Although there does not appear to be sufficient evidence to conclude that the father has abused the children, there does appear to be a sufficient basis to conclude that the children may (the court's emphasis) have been abused and were at least inappropriately exposed to sexual material or activity." She makes no mention of who it was who may have abused or exposed the children. Each parent had different nominees.
5. The court appointed psychiatric evaluator, Dr. Herman, concluded "sexual abuse of these children by their father did not occur."
One professional reached a different conclusion:
A DCYS social worker found "abuse confirmed".
The conflict focused on the differing conclusions of Dr. Herman and the DCYS worker, and the means by which each reached their contrary conclusions.
Of the two, Dr. Herman was the more credible witness. Board certified in pediatrics, psychiatry and child psychiatry, the author of eighteen articles in professional journals, twelve articles in mass circulation magazines, four chapters in professional textbooks and a recent book of his own dealing with custodial disputes, Dr. Herman is a formidable forensic force, having served courts in both New York and Connecticut. He spoke with conviction and supported his positions credibly. CT Page 6397
He testified openly, admitted to errors when they were called to his attention, defended his conclusions without irritation, and gave respectful thought to conflicting possibilities.
Dr. Herman concluded "there is no evidence to support the allegations that Mr. Van Meter sexually abused his boys." He analyzed the parade of mother's claims of abuse and rejected them.
The court concurs, finding mother's listing of father's alleged abusive behaviors to be beyond credibility.
Mother claimed the following, among a substantial list of claims, as evidence of father's abuse: his presenting Aesop's Fables as a gift; a claim that he cross dressed in a wig, added helium balloons to simulate breasts and beat the children; the scar on his arm and his broken arm as evidence of his having been abused while a child; two long and heavy wrenches claimed to be used by father to molest Benjamin by insertion into his body.
Mother's allegations of abuse, and her application for a restraining order, coming within ten days of father's decision that she had been mismanaging the family's finances, his announcement that he intended to remove the family checkbook from her control, and her extreme emotional reaction, are of concern.
Mother's statement to the Brookfield police that she had never suspected her husband of sexual abuse until her conference with her divorce attorney following the financial confrontation, who explained that because her husband had been in Vietnam (as an American fighter pilot) perhaps he had been exposed to young male prostitutes and may, in turn, be abusing the children, was of particular concern.
Mother's persistence in spite of the unwillingness of the local police, the childrens' pediatrician, the childrens' therapist, the family relations counselor and a court ordered forensic pediatric psychiatrist to identify the father as an abuser was of concern.
Mother's detailed and lengthy lists of allegations, which she testifies to being randomly and casually collected, but which suggest sharply focused interrogations of the children, are of concern.
Mother's pattern of presenting additional claims of abuse for each conference with Dr. Herman, which suggests a commitment CT Page 6398 to a finding of abuse against her husband, is of concern.
Mother's history of herself having been a victim of sexual abuse at the hands of her brother as a four year old child, her two hospitalizations for post-partum depression and her electro-shock treatment are also of some concern. Mother seems to equate being abused as a child with probable negative adult behavior or predilections. She focused some on father's childhood injuries, suggesting they were indications that he had been abused in his early years.
Father's absence from the family home, coupled with mother's commitment to his guilt, and her repeated opportunities to coach the young boys are of concern.
When father called, asking Ben what he had been doing and if he was riding his bike — her interruption of the call, because father was "pumping" Ben and she "wasn't thrilled" with the length of the call or its contents — is of concern. It evidences a willingness to interfere with the father-son relationship on a whim.
Of concern to the court was an incident following Counselor Raider's visit to mother's home. The boys misbehaved badly. Mrs. Van Meter soon reported to Counselor Raider that the boys told her their behavior was instigated by her husband who had warned the boys to misbehave as they did. She reported the boys told her their father threatened he would watch them through the window and would hit them if they did not misbehave.
This court finds there is insufficient credible evidence to conclude that abuse occurred or that the defendant father abused either of his children.
FIXED BELIEF
Of particular concern to the court is Dr. Herman's conclusion:
 "There is clear evidence that Margaret Van Meter has a very strong and fixed belief that her husband is a molester of the children and that there is no evidence that this belief will he altered."
As a result of that conclusion, Dr. Herman recommended that it was "in the childrens' best interest to live with their father." He thought that living with a parent with such a fixed belief would make it "extremely difficult for the children to have any kind of a normal relationship with their father." He continued his theme of concern with mother's fixed belief by CT Page 6399 saying "I believe they would continue to suffer needlessly if they were to remain with Mrs. Van Meter, who would most likely hold to the message to them that their father sexually molested them. They would remain confused and uncertain and she would continue to find `evidence' supporting her allegations."
DEPARTMENT OF CHILDREN AND YOUTH SERVICES
The social worker from Connecticut's Department of Children and Youth Services was the only witness to confirm that the father had committed sexual abuse.
It was difficult for the court to reject Dr. Herman's diagnosis in favor of the DCYS social worker. She was defensive. She admitted to few doubts. She avoided conflicting testimony by finding no conflict. When pressed on cross examination she retreated to stating that she is not an expert, describing experts as people who set the standards for examination (of children).
The court believes Dr. Herman meets her definition of such an expert. See Defendant's Exhibit 29, Stephen Paul Herman, M.D. — Curriculum Vitae.
The DCYS worker has a social work degree from the State University of Buffalo, New York and additional courses in protective social work. She testified to learning her child abuse investigative techniques from Suzanne M. Sigroi, M.D., a highly regarded child abuse specialist, at a three day seminar, by reading portions of Dr. Sigroi's 1982 respected text, Handbook of Clinical Intervention in Child Sexual Abuse, and through her direct supervisor and her program supervisor.
She testified that the DCYS standard she used for confirming abuse is:
 "Whenever a child relates a sequence of events which is credible, we (DCYS) conclude sexual abuse."
That standard is a simple one. It's simplicity may explain why she, alone, among six professionals — an investigating police officer, a pediatrician, the childrens' therapist, a Family Relations counselor and a forensic pediatric psychiatrist — why she, alone, confirmed abuse by the father.
Each of the other professionals would appear to have employed more stringent standards. The DCYS standard, as cited here, by this employee, appears to be a modest standard, perhaps a standard by which the innocently accused can be too easily adjudged guilty of this heinous behavior. In this case, under CT Page 6400 these circumstances, this court finds the DCYS standard, as presented, to be inadequate.
This court is concerned that allegations of sexual abuse may be presented where the only witness, and the only standard, will be a DCYS worker and the standard presented in this case. The result may well be catastrophic for an innocent accused.
This case suggests that no sexual abuse claim involving DCYS should go forward without an independent skilled forensic child expert to challenge and balance the DCYS standard presented here. A DCYS finding of "abuse confirmed' does not necessarily mean that sexual abuse occurred but may well merely mean that a DCYS worker found that the modest DCYS standard presented to this court had been met.
Addressing himself to the DCYS standard used in this case, Dr. Herman testified, "I would hope and pray that is not the standard DCYS follows."
He went on to note that the standard does not bring to bear clinical skill. It fails to consider emotional turmoil in the child, the psychological state of the child, or something diagnosable that is forming the child's statements. He commented further that "these children, in fact, do have something that is diagnosable: adjustment disorders relating to the divorce and family turmoil. They may have an anxiety disorder, a conduct disorder or an oppositional disorder." "In a lay person's terms", he testified, "these children are disturbed."
The court notes that in addition to the standard the DCYS worker cited and in addition to Dr. Herman's concerns about the psychological state of the child alleged to have been abused, other issues may be appropriate for DCYS to consider:
Physical evidence of the abuse.
Witnesses or other corroborating evidence.
The accused's reply to the allegation. Is that reply clear and credible?
The possibility of false accusations.
If expanded to incorporate whichever of these factors are appropriate, and perhaps others as well, the standard offered here may become more realistic and more reliable. It might then generate more confidence in the agency's findings.
It should also be noted that had the DCYS interviews been CT Page 6401 videotaped, a policy being recommended by an increasing number of consultants, the responses elicited and the techniques used might have generated more respect. Such a tape, or series of tapes, might also have reduced the number of subsequent interviews of the beleaguered children required by others.
MISCELLANEOUS
The court recognizes that Counselor Raider had access to the records of the children's pre-school, Rancho Bernardo in California, and Dr. Herman did not. When questioned, Counselor Raider thought those records were of value, as was her conversation with Dr. Westberg, therapist to Mrs. Van Meter, and her conversation with Dr. Lisa Diamond, who consulted with Mrs. Van Meter, But the additional insights gained from those reviews did not lead Counselor Raider to conclude father had abused the children. There is no logical reason for assuming that access to them would lead Dr. Herman to reverse himself and find that father had abused the children.
The court also recognizes, sua sponte, that Dr. Herman's report was concluded on March 21, 1991, fifteen months ago. Its age prevents the court from basing a custodial finding on its recommendations. See O'Neill v. O'Neill, 13 Conn. App. 300
(1990). His recommendations regarding the allegations of father's abuse, however, are not affected by the passage of time, the allegations having been far closer in time to his evaluation.
SOLE CUSTODY
Each of the competing parents filed pleadings seeking only sole custody of the minor children.
Thus, the rulings of our Appellate Court in Emerick v. Emerick, 5 Conn. App. 649 (1988) and its progeny, combined with the stubborn adversarial stance of each of the competing parents, limit this trial court to a choice between sole custody to the mother and sole custody to the father. That the best interests of the children may indicate otherwise is not permitted to become a factor. See Lombardo v. Lombardo, No. FA-90-0301847, November 14, 1991 Memorandum of Decision.
Sole custody, however, is but a general concept reflecting a broad category of parental relationship. It is nowhere defined in the statutes, nor have our courts defined the term.
Section 46b-56a(a) defines joint custody, holding that it means:
"an order awarding legal custody of the minor child to CT Page 6402 both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by both parents in such a way as to assure the child of continuing contact with both parents."
Trial courts, having the benefit of observing each of the parents during the hearing as well as the testimony of other relevant observers, both lay and professional, and the insights provided by other evidence, have traditionally been empowered to define joint custody in individual cases in varying terms within the general statutory definition.
That traditional trial court definitional power was recently recognized and approved by the Appellate Court in Tabackman v. Tabackman, 25 Conn. App. 366, at 369 (1991) where it said:
 "joint custody is the trial court's own determination of the meaning of its order."
Supporting the trial court's power to define the meaning of joint custody in individual cases, thus enabling the trial court to reflect the best interests of the children in each individual and unique fact situation, applies with equal logic and force to the concept of sole custody.
COUNSELING
The court is influenced substantially in its custodial choice by mother's pledge both during final argument, and in her amended Stipulation filed with Plaintiff's Claims for Relief, to participate in counseling with her children. That pledge is an essential element in this court's custodial decision.
The court sees mother's fixed belief that her husband is an abuser, if it is not altered, as a potential source of grave damage to the minor children. It is clearly in the best interests of these minor children that they and their mother counsel regularly and sincerely together with Hart Van Meter.
If any of the elements of mother's counseling pledge are not fulfilled, or if she thwarts in any way father's attempts to join that counseling process, this court would hope that succeeding courts would find such behavior to be a substantial change of circumstances sufficient to support a Motion to Modify both custody and visitation, which motion may include a request for joint custody if the movant is so inclined. This court would also hope that succeeding courts would coordinate consideration of any such motion with an up-dated evaluation of the parents and the children by Stephen Herman, M.D. together with his recommendations for the court. CT Page 6403
If mother is willing and able to work towards substantial diminution, and eventual eradication, of her fixed belief, she is the preferable custodian.
If she is unwilling or unable to do so, the weight of the evidence of nine days of trial compels this court to conclude that the damaging potential of her custody is far greater than the damage likely to flow from father's custodianship.
FAULT:
Although the marriage was experiencing difficulties prior to September of 1990, the court finds the marriage had not broken down irretrievably until Margaret Van Meter's restraining order and her allegations of child abuse. It therefore finds her to be primarily at fault for the irretrievable breakdown of the marriage.
FINANCES:
Father's net weekly income is $1,813.78.
Mother is unemployed.
Because the net weekly family income exceeds $1500, the Child Support Guidelines do not apply.
The court finds the marital assets to be valued as follows:
31 Green Knoll Drive, Brookfield, Ct. $332,000
 Mortgage 232,000 -------
100,000
1988 Plymouth Voyager 6,000
1978 Buick LeSabre 400
Savings for Ben and Jim (3,000)
Farmers and Mechanics Bank 5,000
401K 34,700
 American Airlines retirement plans 330,000 -------
CT Page 6404
364,700
10/15THS: 243,000
Marital assets: 354,400
 Less 80% of the net proceeds of husband's premarital home, sold after 18 months of marriage: 57,600 ------ Marital assets: 296,800
40% of the marital assets: 118,720
The court finds that plaintiff received $2000 for marital assets improperly sold by her which shall be deducted from her share of the marital assets: 2,000
Plaintiff wife's share of the marital assets: 116,720
The court did not deduct defendant husband's continuing support of the children of wife's first marriage — tuition, automobiles, room and board, etc.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall enter:
1. DISSOLUTION
This marriage is dissolved on the grounds of irretrievable breakdown.
2. CUSTODY
a. Plaintiff mother shall have sole custody of the minor children.
b. In her exercise of that sole custodianship, however, mother is directed to behave in such a way that the children, in their best interests, do not forfeit the benefits of their father's continuing involvement in their lives. She is to consult with the father on all major decisions involving the children's health, education and welfare.
c. If mother and father are unable to reach a mutual agreement after an exchange of relevant information, views and CT Page 6405 alternatives, mother's decision shall be final.
d. Mother, however, is not to use this final decision making power to bypass or minimize father's role in the childrens' lives.
e. Mother shall have an affirmative duty to communicate all relevant information to father and is further responsible for affording him a full opportunity to enter into meaningful and fruitful discussions with herself as well as with the children. Father's thoughts are to be given respectful hearings.
f. If such continuing communication and respect are denied father by mother, mother shall be deemed to have violated this grant of maternal authority and this court invites father to seek modification of that authority and that relationship.
g. To avoid any future misunderstanding of the intent of these and other orders of the court, mother should understand that the court is concerned that she not continue to evidence a strong and fixed belief that Hart Van Meter is a molester of the children.
h. Prom this day forward, Mrs. Van Meter is not to repeat any of her allegations, suspicions, beliefs or possibilities of father's abuse to the children except during therapy sessions in the presence of the therapist referred to in order 5, below. If she cannot do so, she will represent a threat to the well-being of the children.
3. ACCESS
a. Defendant father shall have reasonable rights of access to the minor children, which shall include, but not be limited to, the following at this time:
i. Three two-day periods each month. These periods should be on weekends during the school year. During the first ninety days the visitation period will not be overnight. Defendant father shall advise the plaintiff mother of his schedule for this and other accesses by the 29th of each month for the following month.
ii. One afternoon each week from the time the children arrive home from school until 7pm.
iii. Parents shall alternate Memorial Day, July 4th, Thanksgiving weekend from Thursday at 5 p.m. to Sunday at 5 p.m., Christmas Eve, Christmas Day, Benjamin's birthday and James' birthday. Father will establish the alternating schedule, Father CT Page 6406 shall have Father's Day. Mother shall have Mother's Day.
iv. Beginning in 1993, defendant father may have the children for three weeks of his choice during July and August, two of which may be successive weeks, at father's option.
v. Defendant father shall have the spring school vacation.
b. Plaintiff mother shall do nothing to interfere with father's access by scheduling, or permitting the scheduling, of anything that competes with his access.
c. The court anticipates that father will seek additional access from time to time and would expect mother to cooperate with all good will.
d. All communications regarding father's access are to be conducted solely between the parents.
e. Mother shall keep father fully and promptly informed of all the children's scheduled activities.
f. Father may attend all events involving his children.
g. Father shall be entitled to "parents tickets" for all special events involving his children. Mother shall have an affirmative duty to provide such tickets at the earliest possible date. If there is any cost involved, father shall, of course, pay for his own ticket.
h. Father shall have telephone access to his children during their normal waking hours.
i. During any illness or injury of the children, father shall have the right to see them.
4. CHILD SUPPORT
a. Defendant father shall pay plaintiff mother $250 per week per child until the child reaches his eighteenth birthdate, dies, marries or is sooner emancipated.
b. Defendant father shall be entitled to claim James as a dependant for income tax purposes. Plaintiff mother shall be entitled to claim Benjamin. Whenever the tax codes deny father any benefit from claiming James, mother may claim both children.
5. MEDICAL INSURANCE CT Page 6407
a. Father shall provide health insurance as available at his place of employment for the benefit of the minor children.
b. All unreimbursed medical, dental (including orthodontia), psychiatric/psychological counseling, prescriptive, and optical expenses incurred on behalf of the minor children shall be equally divided by plaintiff and defendant.
c. The sole exception to the equal division of unreimbursed medical costs set forth immediately above shall be father's responsibility, until August 1, 1993, to pay the full uninsured costs of all psychiatric or psychological sessions in which he participates with the children or mother. The counseling is the subject of an amended Stipulation by plaintiff mother and is discussed in some detail in the findings under the heading, Counseling.
i. The counselor to be selected shall be a board certified psychiatrist or licensed clinical psychologist and shall be selected by the plaintiff from a list of three agreed upon by the counsel for plaintiff, defendant and the minor children.
ii. The psychiatrist or psychologist chosen shall be given a copy of Dr. Herman's report and the decision of this court.
d. The provisions of 46b-84(c) shall apply.
e. Father shall assist mother in obtaining the existing medical coverage for the three year Cobra period at her own expense
6. LIFE INSURANCE
a. Defendant father shall maintain $170,000 of insurance on his life, naming plaintiff mother as irrevocable beneficiary thereof as long as he is obligated to pay child support for the benefit of either child.
b. Father shall furnish mother, on her request not more than once each calendar year, proof reasonably satisfactory to her, that said life insurance exists in the specified amount, without any liens or diminutions of any kind, and that the beneficiary is as required by this order.
c. In the event plaintiff mother receives less than $170,000 upon husband's death, the unpaid balance shall constitute a charge against his estate in favor of the plaintiff mother. CT Page 6408
7. ALIMONY
Defendant father shall pay plaintiff mother $450 a week as periodic alimony until either plaintiff or defendant dies, plaintiff remarries or until July 1, 1997, whichever shall first occur. The term, until July 1, 1997, shall be non-modifiable.
8. ASSETS
a. Defendant shall pay plaintiff $116,720 as follows:
$30,000 within 30 days hereof,
$30,000 within 60 days hereof, and
$56,720 within 180 days hereof,
as defendant's share of the marital assets.
b. Should he elect to do so, defendant is empowered, in his sole discretion, to transfer to plaintiff his 401K plan for its face value as payment towards any of the money due her.
c. Plaintiff shall vacate the family home in Brookfield in good working order and broom clean upon receipt of the second payment and shall transfer her interest in said home to defendant by quit claim deed simultaneously with receipt of the final payment.
d. Any payment not received by plaintiff on or before the scheduled date shall carry interest of twelve per cent per annum from the date of this judgment.
e. While residing in the home, plaintiff shall be responsible for the payment of all bills associated with the home to the date she vacates the premises, except the mortgage which defendant shall pay.
f. Defendant shall transfer the 1988 Plymouth Voyager to plaintiff forthwith.
g. Defendant shall retain all other marital assets. Plaintiff shall promptly sign all documentation necessary to effectuate transfers of same when prepared by defendant and presented to her.
h. Defendant, in his sole discretion, may dispose of the childrens' $3000 bank accounts for their benefit.
9. PERSONALTY CT Page 6409
Defendant shall have his choice of one-half of the contents of the family home after each of the parties has removed their pre-marital belongings and gifts from their family.
10. DEBTS
a. Husband shall be responsible for and pay the following, holding plaintiff wife harmless and indemnified therefrom:
USAA Mastercard $3,424
AA Credit Union 5,662
DR. VAN METER 18,000
Mulvey Korotash unknown
b. Wife shall be responsible for and pay the following, holding defendant husband harmless and indemnified therefrom:
G. Fox $ 145
Sears 4,200
Discovery 2,900
Mary Banker 4,300
J.C. Penney 300
Student loan 1,000
Dr. Alice Higgins 3,950
IRS 1991 2,000
Citibank Visa 1,500
Chase Mastercard 875
ATT Universal Card 2,800
Amaco 350
Discover 780
11. ATTORNEYS' FEES
Each party shall pay their own attorney's fees. CT Page 6410
12. COUNSEL FOR THE MINOR CHILDREN
a. The court finds the legal services of counsel for the minor child to fairly and reasonably total $22,500.
b. Each of the parties shall pay one-half thereof as follows:
25% within 30 days
25% within 60 days
50% within 180 days
c. The court wishes to express its appreciation to Attorney Michael J. Manion for the quality of his efforts.
12. CONFERENCE WITH THE CHILDREN
a. The children of this marriage are obviously deeply affected by the court' decisions entered today.
b. Counsel for the minor children is to schedule an immediate conference with the clients, read this decision to them, explain it to them as it is read, and give each of them a copy of the decision for them to keep.
c. In addition, counsel shall give each child one of counsel's business cards and advise the children of counsel's continuing availability for consultation.
d. Following the conference, counsel for the minor children shall forward a memorandum to the court, notifying it that the conference has taken place.
14. APPEAL
The foregoing orders with respect to custody and visitation and child support shall stand and operate as interim orders of the court during the pendency of any appeal.
15. Mother's maiden name of Bauker shall be restored.
JOSEPH L. STEINBERG, JUDGE CT Page 6411
CT Page 6411